at all. Appeal number 20-1650. Attorney Woodcock, please introduce yourself on the record. Yes, Timothy Woodcock for appellant Christopher French. I would like, with the court's permission, to reserve three minutes for rebuttal. Yes, you may have it. Thank you. As the court is aware, this case involves two different incidents. The first incident concerned an arrest of Christopher French for violating a notice of harassment order, a notice to cease harassment. And the second concerns an entrance into the curtilage of his house at 5 a.m. after the second or third of other no-knock efforts. Let me first direct the court's attention to the statute applicable was Maine's cease harassment notice, section 506A of the criminal code, which provides that a person having been served with this notice by a law enforcement officer may not engage in a course of conduct without reasonable cause with the intent to harass, torment, or threaten another person. This is a statute that actually works in conjunction with other statutes, the protection from abuse statute and the protection from harassment statute, both of which require initiating court proceedings and can result in the imposition of a no-contact order. A cease harassment notice does not have that authority at all. A cease harassment notice actually is notable for the vast area of conduct that is not covered by the statute. And I believe this is a legislative intent to ensure that people who end up in fractious situations have an opportunity, that the law wants them to have the opportunity, working within the confines of the limitations of the notice to work out their differences without further law enforcement involvement. In this case, there is no doubt that on the night of the notice was issued, Christopher French and Samantha Nardone were having a tumultuous episode. Mr. French's conduct that led to the imposition of the cease harassment notice was appropriate and the notice was warranted. And after he was served with the notice, he did send a communication, which arguably could be considered tormenting, but that essentially is it. The next morning, he began trying, he realized, and I think his messages show this, he realized that he had been, acted very badly, and he attempted to patch things up. At the same time, he was working under the limitations of a 24-hour cease or a no-trespass warning, an oral no-trespass warning, so he could not go over and seek out Samantha Nardone, his girlfriend, to patch things up in that way. Moreover, I would add, throughout the entire episode here, at no time did Mr. French ever violate that no-trespass notice. In fact, his efforts to find Ms. Nardone at other places were fully consistent with his observance of that notice. So here, the officers erred in that they treated this cease harassment notice as a no-contact order. And you can see that in the way in fact, there really is very little evidence they did review the messages individually. They're trying to figure out what exactly Mr. French was saying. Most striking among this omissions is that Mr. French was told the night before by the police officers, Samantha Nardone. Mr. Woodcock, given the limits of time, without at all minimizing the importance of the arguments you're making, do you want to focus on the September incident? Yes, I'd be happy to do that. That would be very helpful. I think it's in your brief, but I'd like to hear you summarize it now. I would like you to very specifically describe the actions taken by the officers at the scene of Mr. French's Then as I understand it, there is an interval. They leave, and then two, three, perhaps four officers come back, and there is another knock-and-talk approach. So could you very specifically describe what happened, and what was the interval between the two episodes? Thank you, Your Honor, for that invitation. Yes. I think, Your Honor, the most detailed rendition of this comes from the report of Officer Christopher Gray. And Officer Gray, the court may recall, did not have a body camera, and so there is no recording of the initial knock-and-talk. Although Officer Morse did have a body camera, he did not activate it. So the initial knock-and-talk, which occurred about five in the door, they knocked on the door, they announced themselves, and no one came to the door. They did notice lights were on. They could even look through the windows, but nobody came to the door. Then actually, according to Officer Gray's report, Officer Morse left. Officer Gray attempted another knock-and-talk. He did the same thing, but this, of course, is not caught on camera. Again, announced himself as police. He actually saw a male subject who was in the basement look out and then duck back away and cover the window. And in the meantime, all the lights in the house, or most of them, went off, and Officer Morse returned. When Officer Morse returned, he had with him two Old Town police officers, so there were four officers at the scene at all? No. Officer Gray stayed on the scene and observed the house, and Officer Morse went up to check on Ms. Nardone and her roommates and then came back. When you say stayed on the scene, you mean stayed in the curtilage? I frankly don't know where exactly he was. I believe he either went across the street or went to his cruiser, but I don't believe he was in the curtilage at that point. Okay. Go ahead. So there's the first knock-and-talk. Yes. Then there's a period interval where no one's in the curtilage. That is correct. Okay. Well, let me qualify that. I believe that it's not exactly clear from Officer Gray's report, but he either left the curtilage and went back and did a second effort to rouse someone in the house, but he left, as my understanding, he left and waited for Officer Morse to return and observe the house from a position outside the curtilage until Officer Morse returned. And what was that period of time? These are very limited periods of time. I think we're talking a period of perhaps about 20 minutes altogether, maybe less. Okay. So 20 minutes he's pulled back from the house, he's just observing it, and then the other officers come up only. Now it's not just Morse, it's two other officers. That's correct. And when I say 20 minutes, I believe, Your Honor, that's from the first effort to the third effort. It's a period of about 15 or 20 minutes, I believe. That's time. So just very quickly, so what, when the officers return, there's been this interval which you've described as 20 minutes, what then happens? How do they then approach the residents? What do they do? Your Honor, at this point, a good deal of this is actually captured on video recording. And as the court will recall, Officer Gray did not have a camera, so we don't have his body camera footage, but we do have Officer Morse's. None of the other two officers had cameras, by the way. Officer Morse and Detective Fearon, who was from a adjacent police department, they went to a window which they believed to be Christopher Wrench's window, which was on the ground level, stood in a narrow strip of land that would fall within the curtilage and banged repeatedly on the frame of the window, which sounds like a metal frame and it makes quite a lot of noise. And as they were doing so, Detective Fearon, on the one hand, was inviting Mr. Wrench to come to the door. Officer Morse was ordering him to come to the door. And while that was happening, Officer Gray was at the front door, which also had a metal screen door in front of it, at least a storm door of some sort, and he was rat-a-tat-tatting in a very vigorous and loud way on that door so that you had essentially the people inside were being bombarded with loud knocks and demands to come to the door from both the front door and the bedroom window. So that was what was going on as they tried to get their attention. And I do think it's important for the court to understand that there is a contrast here between the initial effort to rouse the inhabitants, the occupants, where lights were on, windows were uncovered. And in the meantime, after this initial effort, the windows are covered and the lights go off. And the officers testified, and I recognize their understanding is not determinative here. Nonetheless, an objective officer would also recognize that those are signs that the people have actually understood the police are coming to the door and want them to come to the door, and they are rejecting that invitation. And here is where I think the language of Jardine really comes into play. For there, the court did talk in terms of the habits of the country. It really would be, I think, difficult to imagine any other circumstance of life where just coming to and from a door, a house where you don't know the occupants but you want to get their attention. There is a real custom here. We all understand what it is. And I think in Jardine, the court understood two things. First, they understood that we're talking here not about us. Counsel, please, you're well over time. Judge Lopez asked you to explain factually what happened. I do think you can save your legal arguments. You've reserved three minutes of rebuttal. But are there other factual questions from my colleagues? I guess it's a combined legal point. But could you isolate the factual circumstances that you think violate the clearly established principle of law? Is it the approach to the window and the banging on the window? Is it the window plus the banging on the door simultaneously? Is it the coming back a second time at all? In other words, what is the point at which you think clearly established law makes it clear that they went too far? Your Honor, I think it would be at least arguable that going to the door at 5 in the morning violates the standard. However, I don't think the court needs to reach that issue. I think the determinative issue is when an objective officer would have realized that the general… Please tell me what facts are there that you think meet that standard. Just tell me which ones. There may be others that also you think, but what are the ones that most clearly make the case for you that they went too far under established law? The facts that the occupants of the house understood there was a desire that they come to the door and they rejected that invitation by, A, not answering the door, B, turning off the lights, C, not responding in any way to the cacophony that the officers had set up outside. The officers understood when they first went there that that invitation, that license had been withdrawn by the objective manifestation of the occupants of the house. I think that's really the clear violation. Thank you. All right. We'll hear you for three minutes, rebuttal. Ms. Park? Good morning. Counsel, you should proceed as you want, but I think you might be well advised if you focused on the September incident, which has been the focus of our questions. Clearly, you should cover whatever you wish to, but I think it might be useful to us if you focus on the areas of inquiry we've been pursuing with Mr. Woodcock. Understood, Your Honor. Just briefly, I wanted to point out that the appendix at page 286 describes the first knock and talk conducted by Officer Morse and Officer Gray. Attorney Woodcock referred to Officer Gray's police report. However, the statements of fact, lots of them are admitted by Attorney Woodcock, are set forth on those pages. Turning to the question about clearly established law here. Mr. French relies exclusively on Jardines to argue that that case. I apologize if I may interrupt. Mr. Woodcock, please mute your device. We can still see in your office. And I apologize for interrupting. I just wanted to clear that up. Please go ahead. Attorney Park, I apologize. Thank you. Jardines is fundamentally different than this case. In Jardines, the Supreme Court considered whether introducing a trained canine to the French front porch to alert for narcotics constitutes a search within the meaning of the Fourth Amendment. Here, we're talking about the permissible scope of a knock and talk. And Jardines did not address the many factors that are at play here, including those identified by Your Honor Judge Barron. Here, there's unusual circumstances. For one, the building that Mr. French resided in, 13 Park Street, is not a single-family residence. It is more akin to an apartment. And Officer Morse knew where French was living at the time. The officers, and I'm talking about the ladder knock and talk, the officers walked down the neighboring driveway, which is fully exposed to the public, and knocked near the window frame. They knocked there for approximately, it was less than three minutes. And you can see this in Appendix 51, starting at… Can I ask you a question about that? So, one thing that does seem clear from Jardines, and from the Kentucky case, is that there's got to be an implied license. That doesn't seem to be disputable, that in order to be within the realm of those cases, you have to be entering into the curtilage pursuant to an implied license, correct? Yes, as a general matter… So, is there an implied license to have people bang in your bedroom window at five in the morning? That's the part I just find hard to… What custom does that track? Well, Your Honor, I think, given the circumstances here, Jardines and King don't establish that it was impermissible. I guess I'm just asking, the basic idea of those cases, which seem quite clear, is there's got to be an implied license. Are you saying there is an implied license to bang on a bedroom window at five in the morning? I'm saying that… You think there was? Given the circumstances of this case, I don't think it was clearly established that it was impermissible. Given that this building is more akin to an apartment, they were trying to find a suspect, a burglary suspect, who was just seen… Well, I mean, just like take an apartment building, you climb up the fire escape to the second floor, bang on the window, and that would be an implied license? I mean, that doesn't sound plausible to me. So, why is a basement apartment, you go around the side, just bang on the bedroom window? I guess I just don't get why it matters that it's an apartment building. Either there's a license to approach the entrance, or there's not. And how does the bedroom window on the side become an entrance, which there's a license to approach and bang on it? I just don't get that. Well, Your Honor, I guess my argument is that, based on the case law and the precedent, it was not clearly established that this implied license did not exist. Just given all of the unique factual circumstances here. And based on Jardine's, which did not specifically define the parameters of a knock-and-talk at a particularized level, and the case Carroll v. Carman afterwards, the court has not specifically set limitations that every reasonable officer would know that the conduct here violated the Fourth Amendment. Counsel, in Jardine's... Please go ahead. Go ahead. Thank you. No, go ahead. Thank you. In Jardine's, Justice Scalia makes a point that when the police officers go up on the porch, knock on the door, they're doing nothing more than a private citizen would do in going up on the porch and knocking on the door. And he talks about Girl Scouts selling Girl Scout cookies or trick-or-treaters. Now, are you suggesting that the police have more rights in entering the cartilage and going up on the porch and knocking on the door, more rights than a private person would do? Is that your position, that that sort of baseline that Justice Scalia used in Jardine's is not really applicable, that the police, they do have special rights because of their position as police officers to act in ways very different than a private person would do in approaching a resident? Is that your position? No, it's not, Your Honor. Four minutes. Four minutes. I'm not suggesting that the police officers have more rights or more ability to, than the average private citizen under these circumstances. What I'm suggesting is that the law, based on Jardine's, that general discussion of the implicit license was not sufficient to give every reasonable officer notice that the conduct here violated the Fourth Amendment and exceeded that implicit license because of the unique circumstances of this case, particularly that the burglary suspect, Mr. French, was just seen and reported to be entering the victim's residence. And then also the fact that the building is more akin to an apartment. Officer Morse and Detective Fearon walked down the neighboring driveway and tried to get the attention of Mr. French by knocking near the window frame, which is captured on the video at Appendix 51. But I'm not suggesting that they have some more rights. So, I mean, clearly you're not, I mean, really, I guess, picking up on Judge Barron's question. I mean, it's hard to imagine a private individual approaching a residence like this, remotely acting the way in which the police officers did in pursuing their attempt to make an inquiry of Mr. French. I mean, to the extent that the way in which the police can conduct themselves is informed by the way in which private individuals can approach residences. And that's a point Justice Scalia makes. I mean, you're certainly not suggesting that there's anything remotely comparable to what the police did here in the way a private individual could approach a residence, sort of on this implied invitation to come up on my porch and knock on the door. Isn't that correct? This is not remotely the way a private individual would act. Well, if I might, I took Justice Scalia's language for a different lesson, which is that a private individual, especially, say, the brother or the father of the young woman who's just had her house broken into and her cell phone stolen, and indeed the guy comes back and they scream at him and they report that they are afraid, that when there is no answer at something that is a multi-person dwelling with the front door, you can go knock on the window of the person you are after to get his attention, to have him come to the door. I find that perfectly plausible that a private individual would do that under those circumstances. That still leaves the argument that they had made clear that they did not want to come to the door by their actions in turning off the lights at 5 in the morning, so by the time the officers come back at 5.20, 5.25 in the morning, they are faced with a different situation. That argument is also being made here. Correct, Your Honor, and I would like to point out that the kitchen light, the video captures that the kitchen light was still on when they made the latter knock and talk near Mr. French's bedroom window, but in any event, based on Carroll v. Carman, which did not even reference Jardine's, even though it was a knock and talk case, I think the point here is that not every reasonable officer would understand that their conduct violated clearly established law. Ms. Park, I think this, the thought we just had, Judge Lynch's question raises for me, I think just a really critical legal question. One question is whether, and I thought you had answered this already, saying you agreed that it was clearly established that the authority to do a knock and talk has to be pursuant to an implied license. I understood Judge Lynch's question to be from the perspective of the person who would like to make contact. Would they act this way? Well, they may well, might act that way. That's a different question than whether the homeowner has given an implied license. But not unrelated. Let me just ask my question. So just with respect to whether there's an implied license, are you now suggesting that it's unclear under Jardine's and Kentucky v. King whether the actions of law enforcement should be measured as to whether they're consistent with the implied license so long as it's reasonable to think a private individual wouldn't have acted the same way? Do you follow what I'm asking? Unfortunately, Your Honor, I'm not… Okay, so there's the perspective of the homeowner, and we can ask, what have they implicitly licensed people to do? And we can look at the custom to figure out what do people implicitly license people to do. Then there's the reality of how people who are not the homeowner act when they want to get in touch with someone. And they might do just, you know, many things. Like, I'm kind of upset and you're not answering, and I need to get in touch with you, so I'm going to bang on the door. That doesn't necessarily mean it's within the implied license. It just means that's what most people would realistically speaking do. But they may be trespassing. So I guess what I'm asking is, I thought you were agreeing with me that Kentucky v. King and Jardine's tell us we have to look at it from the perspective of what the homeowner has implicitly licensed people to do. And what basis is there for concluding that I have impliedly licensed anybody at 5 in the morning to come bang on my bedroom window? That's what I'm having trouble seeing. And I understand your concern there, Your Honor. I think I would just go back and say that Jardine's and King, and then Kentucky v. King was an exigent circumstances case. And it did discuss the knock and talk generally. But my point is that given the facts of Jardine's, the facts of Kentucky v. King, although there were these general discussions of the implied license and the habits of the country, given that qualified immunity has to be applied at the particularized level of the facts here, it just wouldn't give signal to every single reasonable officer that this conduct exceeded that implied license. And I think that's my point here, is that in the shoes of a reasonable officer, Jardine's would not signal that, given that it was a canine case that brought the dog to the front porch and conducted a search. And similarly with Kentucky v. King, that was an exigent circumstances case, considering whether or not the police could create the exigency. So given those cases and the fact that the appellant is relying exclusively on Jardine's, the law here was not clearly established, and the district court conducted a thorough review of the relevant precedent and concluded just that. Counsel, let me just quote this language from Justice Scalia. This relates to the importance that I understandably attach to the use of a dog. He writes, but introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. Now, Mr. Woodcock suggests that after the initial approach to the building and the way in which the individuals inside responded, making clear Mr. Woodcock would argue that they did not want to talk to the police. Nevertheless, the police come back maybe 20 minutes later and repeat some of the same conduct. Why isn't that determination to come back a second time with the officers knowing how the residents responded before? How could that be seen as an implied license to do what they had done before when the residents never responded? Is there any, to use Justice Scalia's language, is there any customary invitation to do that? To come back a second time knowing how the residents responded the first time? What customary invitation would support that kind of conduct? Well, Your Honor, I think a couple of things are relevant here. First, at the time when Officer Morse came back, at that point he had additional information. He had talked to Samantha Nardone and learned that Mr. French had entered into her dwelling. And he met up with Detective Fearon. And as the video captures, Officer Morse indicated that he was going to go back to the police station to try to get a ping on the cell phone and apply for a search warrant. And at that point, Detective Fearon suggested doing another knock and talk. And I think regardless of whether there is an implied license to do another knock and talk, I think there's case law suggesting that it's not entirely clear that there's a limit on how many knock and talks you can do in a given period of time. So I don't think it's clearly established that you can't conduct one knock and talk, not get a response, and then conduct another one. There's case law from the 11th Circuit finding that three separate knocks and talks are reasonable. So given that uncertainty in the law, I don't think that the general language from Jardines is sufficient to deny these officers qualified immunity under the facts of this case. Unless there's anything further, I will rest on my brief. Thank you. Thank you. Mr. Woodcock. Thank you, Counsel. Attorney Woodcock, if you could please reintroduce yourself for the record. Yes, Tim Woodcock, representing Appellant Christopher French. Just a couple of points. First, there's no argument of exigent circumstances here. That has not been raised, so that should not be considered. Second, this is not a multi-unit apartment building. It's a single-family dwelling that's been turned over to college kids who are running it together. It's much like a single-family dwelling in that respect. What I think really is critical here is the license that we're talking about here, I think, has a couple of aspects. There is the customary license that we're all familiar with, and that is a general standing license to approach a house. However, it is in the nature of any license that it is revocable. And the person occupying the house has complete authority to revoke the license, both for the police and for the public at large. And in this case, the objective evidence that the officers had presented after their first effort to conduct a knock-and-talk is that the occupant did not wish to engage with them and made that as obvious as possible by not simply not coming to the door but by turning out the lights and covering the windows. That's a revocation of the license that Justice Scalia was talking about. And I do believe in that case the Supreme Court really was trying to draw a bright line. And I think it's both in the nature of the home, where we're not talking here about a reasonable expectation of privacy test. We're talking about the home and a bright line for the home. If we thought the revocation issue was unclear as to what manifests a revocation, I understand you think it was clear it was revoked. But if we thought that was unclear, did you make an argument below about the banging on the bedroom window itself exceeding the license? Yes, I did, Your Honor. Yeah. Yes, I did. Could you just answer Judge Lynch's observation, which seems sociologically correct? Yes, certainly. And before you answer it, let me vary it. You've given instructions to Amazon when you've ordered a package not to leave it on the doorstep to be sure somebody takes the package. The Amazon guy delivers through UPS or whatever, knocks on the door. Nobody comes. Sees a light on in the bedroom window not far away, goes and knocks on the window to get the attention of somebody to come to the door to open it so he can hand over the package. Can I add one fact to that? Sure. It's 5 in the morning. No, it's after 5. It's about the second attempt. It's 5.20 or something. More at the hour when people are actually getting up. Your Honor, I would say that in a situation like this, any delivery person would go to a door, some kind of a door. Yeah, he does. He knocks on the door. There's no answer. He wants somebody to come to the door so he goes and knocks on the window. There's more than one door in this house. I can't imagine a circumstance under which somebody would go knock on a bedroom window. So they're supposed to go around to the back and knock on the back door rather than knocking on the window which is close to the front door? If you look at the photograph of this house, the driveway is to the right of the house. And there's a side door on that side of the house, not on the bedroom window side, on the other side of the house. You know, and frankly, in New England, it's traditional for a lot of people to go to the side door first. That's sort of an oddity, I think, of our region. But I've never seen any circumstance under which somebody's gone to a bedroom window. And I might add that there is no evidence that the light was on in this bedroom window. With the possible exception of the kitchen, all the lights were off in the house. And windows that had been uncovered had been covered over. Mr. Woodcock, very quickly, I want to ask you a legal question. You are quite clear in relying upon our deans itself for clearly established law. Yet the district court and opposing counsel point out that in the wake of our deans, there is a lot of law from other circuits assessing what are the limits of the knock and talk and what the police can do. And I think the argument is the district court took the position. I think opposing counsel is saying that body of law, if nothing else, suggests that the law is not clearly established. That there is a great deal of uncertainty about how our deans should be applied in the many different factual circumstances that arise. So how are we supposed to evaluate that large body of law in deciding whether the law is clearly established here? Well, thank you, Your Honor. I would start again with Jardine. And Justice Scalia's observation, this does not require fine-grained legal knowledge. This is one of these areas where our human interactions are really quite customary. And without trying to distinguish all those other cases, I would note this court recently decided the case of Irish v. Fowler. And in that case, the Supreme Court's decision in the De Cheney case to be informative, even though that was actually a negative decision. Counsel, actually, it turns on the fact that we had forecast and there was a consensus in the circuits. It does not rely on De Cheney as giving adequate notice. I appreciate that. And the state has said here, you have not even argued that there is a consensus of agreement in the case law that Judge Lopez has just referred to. Your Honor, I have argued that in Jardine, the Supreme Court tried to make this as clear as it could. I do believe the post-Jardine decisions are distinguishable from this one. One thing that is absolutely clear from Jardine is, first, it is a customary social license we are dealing with. Second, the occupant has the absolute right to revoke for any reason, a good reason, a bad reason, or no reason. And the objective evidence is that that license was affirmatively revoked by the occupant. And after that, you have to go home. You have to leave. And that's what Jardine says. You don't get an answer. You must leave. I don't know how more clear it could be. So, just to get more specific, your argument is when the four officers returned, the revocation had been complete at that point, and they could not do anything, including go and knock on the door. That's correct, Your Honor. Judge Barron, you're muted. I just want to clarify one thing about your argument. You did raise below that even if that, or you tell me where I can find it. If the revocation argument fails, did you make a separate argument that the knocking on the window, the circumstances in which they knocked on it, violated Jardine because it went beyond the implied license? Yes, I did. Thank you. Okay. Thank you very much, counsel. Thank you. Thank you. Thank you, counsel. Attorney Woodcock and Attorney Park may leave the meeting at this time.